**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**MANOR NURSING CENTERS, INC., et al., Defendants.**

**No. 71 Civ. 3627.**

United States District Court, S. D. New York.

Oct. 19, 1971.

William D. Moran, Associate Regional Administrator Securities and Exchange Comm. by William Nortman, and Thomas R. Beirne, New York City, for plaintiff.

Bernard Jay Coven, New York City, for defendants Netelkos, Method Leasing, and Upton.

Gifford, Woody, Carter & Hays by Charles L. Trowbridge, and Michael J. McAllister, New York City, for defendant Sutton.

Weiss, Bronston, Rosenthal, Heller & Schwartzman by Richard F. Horowitz, New York City, for defendants Ezrine, Glendale, and Atlantic.

Stanley Kligfeld, New York City, for defendants Benjamin Werner & Co., and Benjamin Werner.

Lawson F. Bernstein, New York City, for defendants Manor Nursing, Capital Cities Nursing Centers, Ira Feinberg, Manor Construction Co., Samuel Feinberg, Marnane, and Halford.

MOTLEY, District Judge.

### OPINION

*Findings of Fact and
Conclusions of Law*

This action for injunctive and ancillary relief was commenced by the SEC on August 16, 1971 pursuant to 15 U.S.C. §§ 77t(b) and 78u(e). Jurisdiction is predicated upon 15 U.S.C. §§ 77v(a) and 78aa. The complaint alleges violations of the anti-fraud provisions of the Securities Laws as to all defendants. 15 U.S.C. §§ 77q(a) and 78j(b) and Rule 10b–5, 17 C.F.R. 240, promulgated pursuant thereto. It also alleges as to certain defendants a violation of the Securities Laws prohibiting sale of securities unaccompanied by a prospectus meeting the requirements of the law. 15 U.S.C. § 77e(b). It further charges as to the defendant underwriter, Benjamin Werner and Benjamin Werner & Co., that other provisions of the Securities Laws and Rules promulgated thereunder were violated. These prohibit fraudulent practices by a broker-dealer in connec-

tion with the sale of securities and require the establishment of an escrow account or a separate deposit of funds in connection with an "all or nothing" sale of an issue such as occurred here. 15 U.S.C. 78o(c) (2) and Rule 15c 2–4, C.F.R. 240.

In addition to injunctive relief prohibiting future similar violations of the Securities Laws, the complaint prays for an order appointing a trustee of all of the proceeds of the "all or nothing" public offering involved in this case, including profits or income received by defendants from the use of such proceeds. A further order is sought directing defendants to relinquish to the trustee any funds received by them in the public offering, including income. The trustee, if appointed, would use his best efforts to seek out those members of the public who purchased the stock and return to them whatever monies may now be due such purchasers, plus interest.

Defendants have all appeared and answered the complaint except Deneso Corporation, Joseph Delmonico, and Jack Naiman. These defendants were duly served. Defendant Arthur Sutton consented to the entry of an injunctive order against him and the appointment of a trustee, if one should be appointed. He has deposited the proceeds which he received ($43,000) in the registry of the court pending the outcome of this case.*

The pivotal claims of the SEC in this action are as follows:

Certain defendants were selling shareholders along with Manor Nursing Centers, Inc., (Manor) of an issue of Manor common stock (450,000 shares at $10 per share) offered on an "all or nothing" basis pursuant to a registration statement and prospectus which became effective on December 8, 1969. It is claimed that these defendants fraudulently failed to amend the registration statement and prospectus to disclose that special compensation arrangements had been made with defendant Christos Netelkos and the three non-answering defendants to induce them to participate in the offering by purchasing shares themselves and by securing others to make purchases before the chaotic and wholly fraudulent closing which took place on February 20, 1970.

The closing was held about two weeks prior to the expiration of the 90 day selling period. At that time proceeds checks were issued to Manor and the selling shareholders by the underwriter although all of the purchasers' checks, most of which were uncertified, had not been cleared. At the closing the amounts of the checks received did not match the number of shares purportedly sold and calculations had to be made repeatedly in an attempt to match the two. Discrepancies persisted. Consequently, during the closing, certain of the selling shareholders purchased additional unsold shares for themselves or their friends, unknown, of course, to the latter, out of the proceeds which they had just received at the closing. Creditors of Manor were also paid at the closing in shares in an effort to make it appear that the issue had been sold.

A few days after the closing, checks presented by Netelkos and the non-answering defendants, totaling more than $2,500,000 "bounced." None of these defendants had any intention of paying for the shares which they purchased. They participated in the offering at the behest of Ira Feinberg (Feinberg) and defendant Ivan Ezrine (who were acting on behalf of the other selling shareholders as well as Manor) to make it appear that the entire issue had been sold.

The checks given to the defendant selling shareholders by the underwriter in turn "bounced", since the underwriter did not have sufficient funds in his ac-

* Nothing in this Opinion is to be construed as a determination or adjudication as to the possible violation of the Securities Laws in issue by defendant Sutton. No reference in this Opinion to defendants or selling shareholders is in any way intended to refer to Mr. Sutton.

count as a result of the original insufficient checks. Although checks from the underwriter bounced, the selling shareholders subsequently received payment for their shares from Feinberg, acting for Manor, out of proceeds which it had received from the underwriter from the sale of shares to the public. These selling shareholders included Feinberg and companies owned or controlled by Ezrine. Feinberg, however, was the only one whose check, received from the underwriter, did not "bounce". This was because, as Feinberg testified on the trial, he and Werner arranged to have the check which he had received for more than $500,000 credited to Feinberg's account at the closing so that he would have sufficient funds in his personal account with which to purchase the remaining unsold shares at the closing in the name of certain of his personal friends.

Feinberg and his counsel, Ezrine, without disclosing the fact by amendment, then frantically proceeded to re-offer the 170,000 shares which were to have been purchased by the non-answering defendants and to collect on the bad checks presented by Netelkos. Again, in connection with this re-offer after the closing, special compensation arrangements were made. The first was with a David Haber who purchased 60,000 shares. The second was with the Daytona Beach General Hospital which purchased 60,000 shares for $11 per share, the offering price being $10. A note was accepted from Netelkos, for the 82,320 shares which he had received for his worthless checks, which was never fully paid.

Thus, although the entire issue was not sold at the time of the closing (because of the fraudulent offer and reckless acceptance of uncertified checks which later "bounced" and as evidenced by the "bootstrap" purchase of unsold shares by Feinberg and Ezrine) the funds received from the public were never returned. Moreover, the underwriter failed to comply with the legal requirement and the requirement of the prospectus that all funds received by him prior to the end of the selling period be placed in a special account in the Chemical Bank so that the monies collected could be returned in the event that the entire issue was not sold within the 90 day selling period as occurred here.

When the complaint was filed the SEC sought and secured a temporary restraining order restraining defendants, among other things, from disposing of any of the funds or profits received by them as a result of the sale of Manor common stock, pending the hearing and determination of a motion made by SEC for preliminary injunctive relief. The hearing on the motion for such relief commenced on August 19, 1971, and was concluded on August 20, 1971.

Upon that hearing the SEC moved for an order advancing the date of trial and consolidating the hearing on the motion with the trial. The motion was denied. The parties were directed to serve and file proposed findings of fact and conclusions of law. Feinberg, president and chief stockholder of Manor, in addition to complying with this directive also filed further affidavits and other documents with the court purporting to show efforts he is making to sell certain real property assets of Manor and its successor, defendant Capital Cities Nursing Centres, Inc., (Capital Cities) for the purpose of raising liquid assets with which to reimburse certain of the public purchasers of the Manor offering. Repayment, however, under Feinberg's plan would be denied to certain purchasers on the ground that they were equally liable with Feinberg, as he sees it, or on the ground that such purchasers have brought their own lawsuit to recover monies expended by them. The court thereupon reconsidered the motion made by SEC to advance the date of trial and to consolidate it with the hearing on the preliminary injunction motion, reversed its prior decision, and set the trial for September 30, 1971. Rule 65, Fed.R.Civ.P. The trial commenced on the date set, continued on October 6, 1971 and was concluded on October 7, 1971.

The court finds and concludes that none of the defendants has offered an adequate defense to any of the SEC's claims, all of which have been proved upon the trial. The court, therefore, grants the relief sought as to all defendants except Samuel Feinberg, Suzanne Marnane, and Gladys Halford. As to these three defendants relief is limited to an order directing them to surrender forthwith to the court appointed trustee all monies received by them as a result of the sale of Manor common stock, together with all income or profits. Each of these defendants is directed to file with the court and with the trustee an affidavit setting forth the full amount received by each of them from the sale of their shares, the investments made by each of such amounts, and the income or profits realized from such investments. Defendant Sutton is directed to file a similar affidavit. Injunctive relief is denied as to defendants Samuel Feinberg, Marnane, and Halford as the SEC did not show them to be any more than the beneficiaries of Feinberg's perverted sense of largesse.

In support of the relief granted the court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

Manor is a Delaware corporation organized on March 19, 1969. On March 31, 1969, in return for 975,000 shares of Manor common stock, Manor acquired 133 County Road, Inc., a New Jersey corporation which owned and operated a 64-bed nursing home in Tenafly, New Jersey. Feinberg, who previously owned all of the shares of 133 County Road, Inc., became controlling shareholder of Manor by virtue of this transaction. Manor then continued to operate the nursing facility in Tenafly and maintains its business office at the County Road address. On July 27, 1970, defendant Capital Cities Nursing Centres, Inc., (Capital Cities) succeeded to the business and operations of Manor by virtue of a transaction in which Manor sold its assets to Capital Cities for 1,623,500 shares of Capital Cities preferred stock. This stock was then distributed on a 1 for 1 basis to the shareholders of Manor. Manor is now in the process of being liquidated.

Capital Cities was organized on March 3, 1969, under the laws of the State of Delaware. Feinberg and Ezrine were instrumental in organizing Capital Cities. Feinberg and defendant Glendale, Inc., which is owned by Ezrine's wife, received a total 120,000 shares of Capital Cities stock, enough to control the corporation. Capital Cities is, therefore, simply a new name for Manor. Feinberg is the principal shareholder and the president of Capital Cities.

Capital Cities owns various properties in New Jersey, and has 8 subsidiaries, including defendant Manor Construction Co., Inc. Ninety percent (90%) of Manor Construction's capital stock is owned by Capital Cities.

Feinberg is president and controlling shareholder of Manor and, by virtue of the transaction of July 27, 1970, is also president and controlling shareholder of Capital Cities. He is an officer of Manor Construction Co.

Defendant Samuel Feinberg is the father of Feinberg and an original shareholder of Manor, owning 10,000 shares of Manor common stock.

Defendant Gladys Halford is the mother-in-law of defendant Feinberg and an original shareholder of Manor, owning 5,000 shares of Manor common stock.

Defendant Suzanne Marnane was an employee of Manor prior to July, 1970, and an employee of Capital Cities thereafter, until December 1970. She was an original shareholder of Manor, owning 12,500 shares of Manor common stock.

Defendant Sutton was an original shareholder of Manor, owning 34,600 shares of Manor common stock. He originally went into the nursing business with Feinberg in April, 1967, with two other individuals, until Feinberg took over the entire business.

Ezrine has been an attorney at law since 1955. He acted as special counsel

to Manor in connection with the public offering of Manor stock. He has been general counsel for Capital Cities since its inception. He resides and maintains his professional offices at 37 East 68th Street, New York, New York.

Defendant Atlantic Services, Inc. is a Delaware corporation with a business address at 37 East 68th Street, New York, New York, the home and office of Ezrine. At all times relevant, Ezrine exercised blanket authority in the matter of securities transactions in connection with the Manor offering for Atlantic Services. Atlantic Services offered 10,-000 shares of Manor common stock to the public at $10 per share, pursuant to a registration statement which became effective on December 8, 1969.

Defendant Glendale, Inc. is a New York corporation whose shares are closely held by Ezrine and his wife. The business address of Glendale is also 37 East 68th Street, New York, New York. Glendale offered 15,000 shares of Manor common stock to the public at $10 per share pursuant to the registration statement.

Benjamin Werner & Co. is a sole proprietorship and is engaged in the business of a broker-dealer in securities. Werner & Co. served as the underwriter of the Manor public offering. Its offices are located at 19 Rector Street, New York, New York. Benjamin Werner is the owner of Benjamin Werner & Co.

Deneso Corporation is a New Jersey corporation whose address at the times relevant herein was 725 Park Avenue, East Orange, New Jersey. Deneso is engaged in the business of financing.

Joseph Delmonico is a principal of Deneso Corporation. He acted on behalf of Deneso Corporation with respect to Deneso's purchase of Manor common stock and issued three checks aggregating $1,700,000 for the purchase of Manor common stock. These checks were drawn against grossly insufficient funds.

Jack Naiman is a principal of Deneso Corporation and acted on behalf of De-neso Corporation with respect to Deneso's purchase of Manor common stock.

Christos Netelkos was a broker-dealer in securities. He agreed to arrange for the purchase of 142,500 shares of Manor common stock by Carlton-Cambrige in return for special remuneration and consideration.

Defendants Method Leasing Corp. and Upton Corp. were controlled by Netelkos and had subscribed for 83,250 shares out of the 142,500 shares arranged by Netelkos. These shares were never fully paid for by any subscriber.

In late 1968 or early 1969, Feinberg met Ezrine through their respective wives. The Feinbergs met with the Ezrines on several social occasions and, after several meetings, discussions were held as to the possibility of a public offering of Feinberg's company, 133 County Road, Inc. As a result of these meetings, it was decided to secure public financing for Feinberg's nursing home business. Feinberg and Ezrine disagree as to who initially suggested the public financing of the company, but the fact remains that the decision was reached to go public. A decision was also reached to organize Manor to acquire the assets or capital stock of the existing Tenafly nursing home and to have the new entity file a registration statement and go public. When Manor was organized, Feinberg and his relatives and friends and corporations controlled by Ezrine received newly issued stock as follows:

| NAME | SHARES OWNED |
|------|-------------:|
| Defendant Feinberg | 975,000 |
| Defendant Glendale | 127,500 |
| Defendant Atlantic Services | 10,000 |
| Defendant Sutton | 34,600 |
| Defendant Samuel Feinberg | 10,000 |
| Defendant Marnane | 12,500 |
| Defendant Halford | 5,000 |
| TOTAL | 1,174,600 |

Ezrine suggested that his companies, Glendale and Atlantic Services, received some of this stock because of all the work he was doing to effectuate the public offering. This work was being done on a

contingency basis. It was also agreed that, in addition to the sales of common stock by Manor, which would raise money for the nursing home operations, monies would also be sought for Feinberg, Glendale, Atlantic Services, Sutton, Samuel Feinberg, Marnane and Halford, so that, as Feinberg put it, they could get something out of the public offering.

Accordingly, a registration statement was filed with the SEC whereby 350,000 original issue shares of Manor common stock would be offered to the public at a price of $10 per share for the purpose of raising, after expenses, approximately $3 million which would be applied to the nursing home operations of Manor. In addition, 100,000 shares then held by the original shareholders would be offered at the same $10 price for the purpose of raising, after expenses, approximately $868,000 which would be paid to such selling shareholders as follows:

| Selling Shareholder | Shares Offered | Net Proceeds |
|---|---|---|
| Defendant FEIN-BERG | 62,500 | $542,500 |
| Defendant GLEN-DALE | 15,000 | 130,200 |
| Defendant ATLAN-TIC SERVICES | 10,000 | 86,800 |
| Defendant SUTTON | 5,000 | 43,400 |
| Defendant SAMUEL FEINBERG | 2,500 | 21,700 |
| Defendant MARNANE | 2,500 | 21,700 |
| Defendant HAL-FORD | 2,500 | 21,700 |
| TOTALS | 100,000 | $868,000 |

All the selling shareholders, with the exception of Feinberg, had earlier received the Manor common stock which they were offering to the public at $10 a share at the price of 5¢ per share. Feinberg, had paid less than 5¢ per share for his stock, in that the book value of 133 County Road, Inc. which defendant Feinberg contributed to Manor in return for his 975,000 shares of Manor stock, was $91,020. In connection with this transaction, Feinberg took back a promissory note from Manor in the principal amount of $81,972. Thus, his net investment was approximately $9,000. He, therefore, paid less than 1¢ per share for his 975,000 shares.

In addition to the foregoing decisions, relating to the number of shares to be offered, the price at which these shares would be offered, and who the selling shareholders would be, it was also determined that the offering would be on an "all or nothing" basis. Ezrine decided, after discussing the situation with Feinberg and Werner, that the offering should be on an "all or nothing" basis, because the money to be raised was to be used for various purposes and because of the great difficulties that would be encountered in allocating portions of the money realized. Feinberg agreed with this arrangement. It should also be noted that the decision to sell 350,000 shares on behalf of the company was based upon a computation prepared by Manor's accountants, showing how much money would be needed to complete certain building and land transactions. The accountant concluded that nearly $3.5 million would be needed to complete the contemplated transactions.

Ezrine was responsible for the preparation of all documents filed with SEC, including the registration statement and Part I thereof, the prospectus. He also suggested the accountant to be used who was an expert in SEC matters, namely Seymour Weiner. Various changes were made in the registration statement and the prospectus that was filed with SEC in response to various letters of comment that SEC had issued with respect to the papers filed. Feinberg was consulted on all occasions with respect to any changes or information that was needed to satisfy the comments made by SEC.

Feinberg thus played an active role in the genesis of the public offering and the preparation of the necessary documents. He not only gave his advice when needed to respond to a SEC comment letters, but also actively suggested that there be sell-

ing shareholders as well as the company involved in the public offering. Furthermore, Feinberg sought to engage in various business transactions which would assist in the offering. Despite certain equivocations to the contrary, Feinberg was fully familiar with the terms of the offering as related in the prospectus.

The high degree of sophistication about financial matters possessed by Feinberg is underscored not only by his active inquiries as to what type of transactions would help the offering but by his general background which reflects a man who has been actively engaged in many complex real estate transactions.

Ezrine arranged for the services of Werner and his company, a registered broker-dealer, to be retained by Manor as the underwriter for the public offering. Feinberg did not know Werner but had met him at one or two social occasions at Ezrine's home. Ezrine delivered to Feinberg an underwriting agreement already signed by Werner. Feinberg never considered using any other underwriter.

The registration statement and prospectus filed with the SEC by Manor and the selling shareholders became effective on December 8, 1969. The registration statement and the front page of the prospectus specifically provided that the offering was being made on an "all or nothing" basis. This meant that all sums collected from subscribers would be returned if the issue was not completely sold out within a maximum of 90 days from the effective date. Since the effective date was December 8, 1969, the selling period expired on March 8, 1970. It was also provided that all funds collected from subscribers were to be held in a special bank account at the Chemical Bank, New York, New York. The prospectus also stated that "arrangements [were] made with Chemical Bank for the escrow of the funds received during the course [of] the offering." It was distributed through the mails and in interstate commerce to purchasers and prospective purchasers.

The prospectus also stated that underwriter's discounts, commissions and expenses of the offering would amount to $472,500. This amount included a $450,000 ($1 per share) cash commission to the underwriter and the broker-dealer selling group and an additional $22,500 for non-accountable expenses of the underwriter and its counsel. In addition, the underwriter was permitted to select certain dealers who were members of the National Association of Securities Dealers, Inc., and to allow such dealers a concession, not in excess of 50¢, for their participation in the underwriting. Thus, any remuneration paid to those who purchased Manor common stock or any guarantees against loss which exceeded the terms specified in the prospectus would be contrary to its terms.

The prospectus provided for a total of approximately $122,500 for expenses incurred in connection with filing, printing, and legal and accounting matters. After payment of the foregoing expenses, the balance of the proceeds realized would be approximately $4 million which, of course, was supposed to be paid to the company and the selling shareholders. The registration statement and prospectus nowhere contain any protection from loss to certain purchasers.

The registration statement became effective on December 8, 1969. In mid-December, 1969, Feinberg, after being assured by Ezrine that there was nothing to worry about with respect to placing the issue, went on a vacation to Florida. Upon Feinberg's return from Florida in early 1970, he was informed by Ezrine that problems were being encountered in selling out the issue. These problems arose because of adverse market conditions and the fact that people who had indicated they would buy the Manor stock were no longer interested. At this time, if not before, Feinberg was asked, and did commence, to take a more active role in helping to sell out the issue.

In light of the difficulties mentioned by Ezrine, he and Feinberg aided the underwriter by attempting to sell the stock to friends and business acquaintances.

During January and February, 1970, Ezrine and Feinberg entered into discussions with various persons with a view toward interesting them in purchasing the stock. These discussions were characterized by the offering to certain persons, in return for their acting as apparent purchasers of Manor stock, compensation and protection from loss. The net effect of these transactions was to create a "bootstrap operation" to give the underwriting a facade of completeness. These agreements were predicated upon making certain payments or arrangements based on funds already derived from the public offering by Feinberg and his companies. These funds would then be used to help finance further purchases of Manor common stock pursuant to the offering. Without these funds the offering could not have been sold and Feinberg would not have had the money available to finance the very purchases he needed to help make the offering successful. This compensation and protection was not disclosed in the registration statement or in the prospectus or any amendments to those documents. It was only by virtue of such undisclosed payments and arrangements that in February, 1970 Werner was in a position to prepare the subscription list which made it appear that the entire 450,000 shares of Manor stock being offered had been sold.

### The Deneso Deal

In an effort to find purchasers of the stock, Ezrine, through an individual named David Jameson, a banker from Little Rock, Arkansas, arranged for a meeting with Deneso Corporation. This meeting occurred at Deneso's offices located at Park Avenue, East Orange, New Jersey in January, 1970. It was attended by Feinberg, Ezrine and Weiner, the accountant for Manor. Deneso was represented by Naiman and Delmonico. At this meeting the Deneso group was asked if it would be interested in buying stock in the underwriting. The group indicated that it would be interested and ultimately agreed to buy 170,000 shares at

$10 per share. It agreed to purchase this amount of Manor stock at the stated price in return for a special arrangement. The understanding or agreement reached protected Deneso from any loss as a result of its subscription by means of a "put" granted to Deneso by Glendale. Simply stated, under the terms of the "put" arrangement Glendale agreed to repurchase from Deneso any shares which Deneso subscribed to in the offering at the $10 offering price for such shares. Additional compensation to Deneso was to consist of a check and promissory note of Glendale totalling approximately $150,000. Both Feinberg and Ezrine have testified that Plaintiff's Exh. 2 reflects the terms of the agreement reached with the Deneso group. The terms of this special arrangement were not, of course, disclosed in the prospectus which was disseminated to the investing public in connection with the Manor public stock offering.

### The Netelkos Deal

Feinberg's search for purchasers led him to the broker-dealer firm of Carlton-Cambrige. Feinberg met with some representatives from Carlton-Cambrige at a restaurant in New Jersey. At this time, Feinberg discussed the operations of Manor. He was advised that it would be necessary for him to see Christos Netelkos before Carlton-Cambrige could make any commitments with respect to participating in the underwriting of the Manor stock. He was told that Netelkos was in charge of the Carlton-Cambrige "back office." Two or three days after this restaurant meeting, Feinberg was called. He was told to meet Netelkos at Hudson Street, in Hackensack, New Jersey. Feinberg met Netelkos. At this initial meeting, Netelkos discussed the nature of Manor's operations. Altogether Feinberg recalled having two or three meetings with Netelkos. Finally, Netelkos presented a proposition to Feinberg whereby Netelkos would arrange for Carlton-Cambrige to participate in the underwriting and distribution. The proposition was subject to the condition that

Netelkos could become the financial adviser of Manor for a year. It was also subject to the proviso that $2 a share for every share purchased be paid to Netelkos as an extra bonus. Despite the fact that Feinberg recalled what the stated compensation for underwriters in the prospectus was, as well as what the stated compensation for participating dealers was, Feinberg's reaction was not one of a flat refusal but rather concern with the fact that he did not believe that Manor could possibly pay any of the sums of money that Netelkos requested. Netelkos then suggested that Feinberg discuss the situation with his attorney and come back. Following this meeting, Feinberg consulted with his attorney, Ezrine, who advised against such an arrangement. Nevertheless, Feinberg and Ezrine worked out an arrangement with Netelkos whereby Carlton-Cambridge became a participant in the Manor common stock underwriting for 142,500 shares. In return for arranging the participation of Carlton-Cambridge in the underwriting, Netelkos received 15,000 shares of stock for which he did not pay. These shares were issued in the name of Laussane Investments and were given to Netelkos. In addition, Feinberg agreed to and did guarantee a loan for Netelkos in the amount of $250,000 as further consideration for Netelkos' work. Again the prospectus failed to disclose that any extra remuneration would be paid for participating in the underwriting or that individuals would be guaranteed loans for aiding in the underwriting.

### The Bernard Orlins Transaction

Another example of the type of transactions engaged in by Feinberg to "bootstrap" the success of the underwriting is represented by a transaction to purchase 12,000 shares of Manor stock by Feinberg on behalf of his "best friend" Bernard Orlins. Feinberg purchased this stock for Orlins with money he received from the underwriting on February 20, 1970. Feinberg gave a check to the underwriter and guaranteed Orlins against any loss. Feinberg sold at least 25,000 shares of the Manor common stock to various friends and acquaintances, which, after learning of the SEC investigation, he has attempted to repurchase.

### THE CLOSING ON FEBRUARY 20, 1970

As a result of the foregoing arrangements, defendants decided to have a closing of the issue on February 20, 1970. By this time, according to the subscription list prepared by Werner, 170,000 shares had been subscribed for by Deneso. Another 142,500 shares had been subscribed for or sold through Carlton-Cambridge. A broker-dealer Scheinman, Hochstin and Trotta, had subscribed for 10,000 shares and the firm of Charles Plohn & Co had subscribed for 5,000 shares. In addition the firm of Burton Davis had subscribed for 500 shares. In addition, according to this subscription list, 26,700 Manor shares were supposedly sold to Ezrine, Glendale and Atlantic Services for reinvesting either their legal fees in the case of Ezrine or the proceeds of their sale as selling shareholders in the case of Glendale and Atlantic Services. Another Ezrine-associated corporation, namely Great Oil Basin, which is an affiliate of Glendale, Inc., is indicated to be a purchaser of 2,500 shares of the stock.

On February 20, 1970 a closing for the Manor issue was held at the National Community Bank in East Rutherford, New Jersey. Werner received anywhere from 100 to 200 checks at the closing, ostensibly presented in payment for the Manor issue of 450,000 shares. Of all these checks, perhaps 1 or 2 were certified. These certified checks were in small denominations of either $500 or $1,000. When the other checks were presented for payment, most of them "bounced." Checks totalling approximately $2.8 million issued by the underwriter, Werner & Co., were also never paid, as Werner & Co.'s checks were issued only on the assumption that the money received at the closing was good.

Upon receipt of the checks at the closing, Werner distributed his checks to the issuer, Manor, and the selling shareholders. He thereafter took the checks he had received at the closing back to New York City to deposit at the Chemical Bank of New York. Thus, at the closing, Werner issued and Feinberg received a check in the amount of $559,379. This represented the total proceeds Feinberg would have been personally entitled to if the entire underwriting had been successful. In addition, at the closing, Werner issued a number of checks aggregating $3,132,500, which sum represented the net proceeds due the company from the sale of the 350,000 shares of its stock. In addition, Werner issued checks to the selling shareholders representing the net proceeds due each of them. These included checks to Atlantic Services for $86,800 and Glendale for $130,200. In addition, a check was issued to Ezrine in the amount of $50,000.

With respect to the checks issued by Werner for $130,200 and $86,800 to Glendale and Atlantic, respectively, these checks were then endorsed over by the payees and given back to Werner & Co. in return for newly issued Manor shares. The net effect of this transaction was that Atlantic Services and Glendale received 8,680 and 13,020 shares, respectively, of newly issued Manor stock, equal in value, at the time, to the proceeds that they were entitled to had the issue been successful. Moreover, despite the fact that the checks received by Atlantic Services and Glendale from Werner "bounced," it was agreed that the transaction described herein should be treated as if the checks received were good and paid, so that Glendale and Atlantic could keep the shares and avoid the intervening transaction of receiving another underwriter's check and issuing another check to Manor.

As a result of this particular transaction, Manor never received the proceeds of the sale of some 21,628 shares (13,020 and 8,630) despite the fact that the company would have been entitled to approximately $216,000 for such shares at the time the issue was closed. The fact that these shares were returned to Feinberg from time to time, beginning on or about October or November, 1970, does not change the fact that the shares were issued under the color of a valid closing, and the fact that the company never received the proceeds due from the sale of such shares.

Had the closing proceeded in a correct manner, the underwriter should have had in its possession, lodged in a special escrow account at Chemical Bank in New York, a sum sufficient to pay for the checks it caused to be issued on February 20, 1970. Alternatively, it should have had certified checks to insure that when such checks were deposited into the special escrow account, they, when added to the pre-existing balance, would have provided sufficient monies to cover all checks issued to the issuer and the selling shareholders. This, however, was not the case. As a result, the so-called "closing" turned out to be nothing more than a prelude to further machinations which allowed the issuer and the selling shareholders to realize substantial sums of money.

## EVENTS AFTER THE CLOSING

Werner did not check to ascertain the worth of the uncertified checks he had received upon the closing. He simply assumed he was acting properly because management, by which he meant Feinberg and Ezrine, went through with the closing. The only step Werner took was to ask the vice-president of the National Community Bank, who was present at the closing, to hold up the checks he had issued for one day. This would give Werner time to deposit the checks he had received at the closing with the Chemical Bank so that he could cover the checks he had issued. Werner admitted that at the time he issued the checks to Manor and the selling shareholders, he did not have sufficient funds on deposit to cover the checks.

### The Deneso Checks

The agreement described above with Deneso, Delmonico and Naiman, was nev-

er carried out in that, three checks, drawn by Delmonico, totalling $1,700,000, which were to pay for the Deneso subscription for 170,000 shares were returned for insufficient funds. When Feinberg learned that the Deneso checks had "bounced", he inquired of the bank and found that at the time the checks had been issued by the Deneso Corporation, Deneso only had $75 in the bank. Nevertheless, it should be borne in mind, that the defendants were all parties to an illegal agreement entered into prior to the closing. The fact that Deneso subsequently reneged on its agreement in no way changes this fact.

### The Netelkos' Checks

As stated above, pursuant to an illegal agreement Netelkos and the broker-dealer, Carlton-Cambrige & Co., became participants in the underwriting for 142,500 shares. Thus, also present at the "closing" were Netelkos and a Mr. Gamarikian as representatives of Carlton-Cambrige who presented checks representing payment for the 142,500 shares. These checks were uncertified. Included among these particular checks were two worthless checks drawn to the order of Manor aggregating $832,500. Only $400,000 worth of the Carlton-Cambrige group of checks did clear. The above-mentioned two checks, aggregating $832,500. "bounced" when presented for payment. They had been issued on behalf of Netelkos' companies, defendants Upton Corporation and Method Leasing, and were to be in payment for shares of stock those companies were buying in connection with the over-all participation of Carlton-Cambrige. At the closing Netelkos got $832,000 worth of stock.

### COMPENSATION TO SELLING SHAREHOLDERS AND MANOR

As outlined above, on February 20, 1970, all monies that should have been received were not received. As a result, with the exception of Ira Feinberg's check, all other checks issued by Werner to the selling shareholders were not paid. Nevertheless, all of the selling shareholders received what they were entitled to had the issue been successful, either in the form of cash or marketable Manor common stock valued at $10 per share. This is borne out not only by the testimony but by admissions made by Feinberg in an affidavit as well as in Feinberg's own Exhibit D which was the 10–K report filed with the Commission on June 30, 1970.

"Note 2" to the financial statements contained in Feinberg's Exhibit D offers a concise summary as to what transpired up to and at the closing and thereafter. A reading of this statement will reveal exactly how much money was received by Manor and the other selling shareholders. This particular note states in part:

On February 20, 1970, the closing date, the underwriter arranged to pay over and/or did issue to the company checks aggregating $3,132,500, representing the net proceeds due the company from the sale of 350,000 shares of its common stock, which shares were issued by the company's transfer agent. The aforementioned proceeds were deposited by the company on February 24, 1970. On March 2 and 3, 1970, checks issued by the underwriter totalling $2,848,975 were dishonored as a result of stop payment orders issued by the underwriter. In addition, checks issued by the underwriter to certain selling stockholders were also dishonored as a result of stop payment orders. From March 5, 1970 to May 1970, $1,011,644 was received and deposited by the company on account of the checks dishonored. Of this amount, $899,769 was retained by the company and $111,875 less applicable expenses of $3,375 was paid over to certain selling shareholders in payment for their dishonored checks.

The foregoing quotation reveals that on February 20, 1970 Manor, itself, received $3,132,500 in checks from Werner representing the proceeds due it. Of this amount, $2,848,975 "bounced", leaving a net of $283,525 in good money received on February 20. Thereafter, it is admitted, that the issuer received and

deposited $1,011,644, which funds represented partial repayment for checks issued by Werner which were previously dishonored. This sum, when added to the $283,525 of monies received and actually collected on February 20, totals $1,295,169, which sum represented the cash proceeds received by Manor by virtue of the underwriting. Thus, it is clear that Manor had this much cash made available to it by virtue of the underwriting. The fact that Feinberg directed that $111,875 be paid over to the selling shareholders in payment for their dishonored checks in no way vitiates the underlying fact that Manor did have this cash as a result of the underwriting. As stated above, Ira Feinberg, a selling shareholder, did receive a good check for $559,379.

Feinberg as president of Manor issued checks to the selling shareholders, which checks were paid and represented the full proceeds to which the following shareholders would have been entitled if the offering had been successful:

| | |
|---|---|
| GLADYS HALFORD | $21,700 |
| ARTHUR SUTTON | 43,400 |
| SUZANNE MARNANE | 22,375 |
| SAMUEL FEINBERG | 21,700 |

In addition to the $1,011,644 received by the issuer in cash between March 5, 1970 and May 19, 1970, the issuer also realized certain other financial benefits. These benefits complete the picture as to the over-all amount of money the issuer received as a result of the public offering. "Note 2" to the financial statements contained in Feinberg's Exhibit D (10–K statement) also states:

As a result of the stop payment orders . . . certain checks issued to creditors aggregating $142,130 and endorsed over to the underwriter in payment for 14,213 shares, were dishonored upon presentment. Since the creditors' claims were satisfied and the shares issued, the capital accounts were appropriately credited for $8.95 per share ($127,206) the net proceeds due from the sale of 14,213 shares.

This indicates that various creditors had agreed to take 14,213 shares of the Manor stock pursuant to the offering in lieu of the $142,130 which Manor owed to these various creditors. Thus, Manor also realized this sum of money pursuant to the offering. Manor Construction Co. received a part of the proceeds of the offering for its construction of one of the Manor facilities.

"Note 4" contained in Feinberg's Exhibit D also reflects that 5,000 shares of Manor stock were issued as consideration for the purchase of a $50,000 construction contract. Manor was thereby further enriched by $50,000.

Defendant Ezrine was paid in shares for his legal services. He received 5,000 shares valued at $10 per share. After the closing, in lieu of the "bounced" checks his two defendant companies received from Werner, Ezrine accepted 21,860 shares. Ezrine later sold 17,000 of Manor stock through the brokerage firm of Thompson & McKinnon for which he received $170,000.

In testimony before the court, Feinberg indicated that certain selling shareholders, who are defendants in this action, namely, Samuel Feinberg, Gladys Halford, and Suzanne Marnane, took no active part in the sale or issuance of the Manor stock. Nevertheless, the fact remains, that all of these defendants received substantial sums of money which were derived from the offering in violation of the securities laws. Indeed, the fact that these particular defendants did absolutely nothing but accept the monies from Manor evidences their total disregard for their responsibilities as sellers of stock pursuant to a public offering. Certainly, these defendants should have been wary of the situation by the time they finally received their money. Questions should have been raised in their minds when they first received their checks from Benjamin Werner which were subsequently not paid. Secondly, the question should have been raised as to the propriety of their receipt of the money, when monies came in, not from

the underwriter, but from the issuer, Manor Nursing Centers. In short, these defendants closed their eyes to facts which they certainly had a duty and obligation to investigate. Finally, Feinberg, Ezrine and Werner were clearly acting on behalf of the selling shareholders, as well as Manor, when they engaged in the illegal conduct set out above. However, since none of these defendants was shown to be in the securities business or any other business at the present time there appears to be no likelihood of any future violations of the securities laws on their part.

### The Re-offering of the Manor Common Stock

As earlier noted, the agreement with Deneso was never carried out because three checks drawn by Delmonico totalling $1,700,000 which were to pay for the Deneso subscription were returned for insufficient funds when presented for payment. Confronted with the inability to dispose of nearly one-third (⅓) of the Manor issue, Feinberg, on the advice of Ezrine, caused Werner to bill out again the 170,000 shares to Ezrine "as attorney" who then attempted to "legally re-offer" them.

### 1. The Haber Deal

After the closing Ezrine introduced Feinberg to a Mr. David Haber. On March 4, 1970, Haber purchased 60,000 shares of the re-offered 170,000 share Deneso block for $600,000. The following day, Haber's money was returned to him. At the time Haber purchased the stock Feinberg was present. Ezrine promised to pay Haber $60,000 to protect Haber from loss as a result of this transaction. Ezrine has admitted that Haber has instituted a law suit to recover this sum of money and that he has already paid out a total of $20,000 in an effort to get Mr. Haber to discontinue the law suit. In assessing the credibility and candor of Ezrine's disavowal of making any such agreements in his efforts to re-offer the Manor stock, the statements that Ezrine made upon the preliminary hearing and trial have been compared

with his prior testimony before the Commission, wherein he stated that $20,000 was paid to Mr. Haber because of certain contacts he had made for Feinberg in New Jersey. The explanation given for this apparent contradiction by Ezrine, (that while before the Commission he was simply giving one reason and in Court was now giving the full story, which consisted of two reasons—settlement of a law suit and mortgage financing) is simply not creditable. It is Haber's testimony and the court finds that an oral promise was made to him which consisted of a promise to pay him $60,000 in cash and 10,000 in shares of registered Manor stock for putting up $600,000 for 18 hours.

### 2. The Daytona Beach Transaction

After the maximum 90 days selling period stated in the registration statement and prospectus had expired, Ezrine, Werner and Feinberg sold 60,000 shares of the original Deneso subscription to the Daytona Beach General Hospital, Daytona Beach, Florida. These shares were sold, not at the $10 offering price, but at the then prevailing market price for the Manor stock at $11 per share. Feinberg knew of this transaction. Ezrine admitted that Daytona Beach General Hospital was charged $11 because the securities were purchased after the 90 day period stated in the prospectus which expired March 8, 1970. If, as defendants have claimed, this was part of a re-offering of the original issue stock which was supposed to be sold at $10 and sold by March 8, 1970, it is difficult to see how it can be contended that there were no improprieties in selling $10 stock at $11 after the selling period had expired. Moreover, no post-effective amendments with respect to this transaction, which would have stated that the selling period was going to be extended, and that the price of the stock would be based on the prevailing market was filed. Manor received $600,000 out of the proceeds of this sale. The broker involved, Financial Guarantee Corporation, received $60,000 in commissions. Ezrine did not know whether the remaining 50,000 shares

which he had attempted to re-offer out of the Deneso shares were ever sold. The hospital has filed suit to recover its money. Ezrine testified that an agreement had been made with the hospital to have a subsidiary of Manor purchase the hospital in connection with this sale.

From the foregoing it is clear that the attempt to re-offer the 170,000 shares of Deneso stock was successful up to the amount of 60,000 shares. As for the remaining 110,000 shares, the consolidated balance sheet for Manor and its subsidiaries as of June 30, 1970 which is part of the 10–K report filed with the SEC (Feinberg's Exh. D) states that 110,000 shares of stock are held in the treasury of Manor. This indicates that the issuer simply took the stock off the market (when it was realized that it could not be sold) and placed those securities in its treasury. The accountant who prepared the financial statements that are part of the 10–K stated that he was unable to ascertain whether these shares were actually purchased as treasury stock.

## FAILURE TO SEGREGATE FUNDS

The Manor registration statement and prospectus clearly represented that all funds received in the public offering would be held in a special bank account at the Chemical Bank in New York City. It was also stated that an escrow arrangement would be made. Therefore, the underwriter, Werner & Co. and its sole proprietor, Werner, were, with the commencement of the public offering in December, 1969, under the obligation to set aside in a special account with appropriate escrow arrangements, all monies received from the public until 1) the issue was all sold and the proceeds turned over to the issuer and the selling shareholders, or 2) it was determined that the issue would not be all sold and the monies then returned. No such special arrangements were made for the Manor public offering. Werner did not set up a new special bank account for the Manor underwriting. He maintained an old account set up in 1967 or 1968 in connection with another underwriting concerning a stock called Uranium Exploration. This account had a small balance in it of $3,775. Werner never opened an escrow account.

More important is the fact that Section 15(c) (2) of the Securities Exchange Act of 1934 and Rule 15c2–4 promulgated thereunder require an underwriter in an "all or none" public offering to hold the proceeds in a special account until 1) such time as the entire offering has been sold or 2) the selling period has expired. Upon the occurrence of the first event, the underwriter is to *promptly transmit all funds to the issuer or other persons entitled thereto.* Upon the occurrence of the second event, the underwriter is to *promptly return all funds to the subscribers if the issue has not been completely sold.* When the selling period expired on March 8, 1970 and the Manor issue had not been sold, the Manor public subscribers were the persons entitled to the funds received by Werner. However, Werner had already dispersed those funds. He took no action to protect subscriber funds. And he clearly never returned the funds to their owners.

## THE RETURN OF THE NETELKOS STOCK

At the closing, Netelkos received 83,-200 shares of Manor stock worth at the time $832,000. Thereafter, Manor received some $210,000 for this stock which included the interest or expenses over a period of two months after the closing. After repeated requests by Feinberg for the money, Netelkos finally gave a note in early March, 1970 for six months (March-September) as payment for the outstanding balance of uncollected monies for $632,500. This note was not paid when it came due in September, 1970. When this note "bounced," Netelkos told Feinberg that he had money in Europe which was frozen in a bank account and that he would go to Switzerland to see if the money could be transferred to Manor. Feinberg agreed to this arrangement concerning the assignment of the bank

account, but when advised by his accountant that such arrangements would not be acceptable, Netelkos was then told to go to Switzerland to have the account put into Manor's name. Netelkos represented that this would be done and that the account would be freed by January, 1971. Feinberg paid the air fare to have someone fly to Europe to make this arrangement. The fare was charged to Capital Cities Nursing Centres. Thereafter, Netelkos presented to Feinberg a letter and various other documents from the Swiss bank wherein the account was allegedly maintained which reflected that the assignment of the bank account had been made. Near the end of 1970, Feinberg's accountant had to certify the returns for the companies. At this time the accountant wrote to the Swiss bank to get a verification of the bank accounts that Netelkos had allegedly transferred to Manor but received no answer. He then called and was advised by the bank that the bank had never heard of Manor. Thereafter, an international registered letter was sent and the response to that letter also reflected that the bank had never heard of the account and that the documents were a forgery. When Netelkos was confronted with this, he blamed it on confusion and suggested that they all go to Europe to straighten it out. Netelkos was supposed to go with Feinberg, his [Feinberg's] lawyer and accountant to Europe but changed his mind at the last minute, claiming he was afraid of airplane flights. Thereafter, Feinberg, along with his accountant and attorney, went to the Banque de Gestion Privee in Geneva, Switzerland. Upon arrival, the Feinberg group asked to speak to Jacques Hassan whose signature was on all the documents Netelkos had delivered to Feinberg. Hassan advised that the signature was a forgery and that the paper upon which these assignments were allegedly made was not the same size as the paper used in Switzerland. Feinberg left Europe without any money. Manor ultimately received back from Netelkos the 83,250 shares and the extra 15,000 shares which was part of Netelkos'

original added compensation for getting Carlton-Cambrige in on the deal.

It is clear that the Netelkos stock was never issued pursuant to the terms of the prospectus and that payment for same was never received. Feinberg actively negotiated with Netelkos to get some type of payment for the stock long after the 90 day selling period had expired in contravention of the terms of the prospectus. The 83,200 shares were simply re-acquired by the issuer and never issued to the public, again contravening the representations in the prospectus. All the arrangements made with Netelkos before and after the closing were tainted. Feinberg played an active role in all the Netelkos transactions from beginning to end. Feinberg's assertion that he has been somehow victimized by Netelkos because he guaranteed a subsequently dishonored note for $250,000 with a portion of the proceeds he received for the offering simply overlooks the fact that this note was purchased to help bootstrap the closing of the issue. The note was purchased with money that Feinberg was not entitled to in the first place. It was purchased in connection with a business transaction which was fraudulent.

CONCLUSIONS
OF LAW

This court has jurisdiction of this action which has been brought by the SEC to enjoin future violations of the Securities Laws. The offer and sale of the common stock of Manor took place in this District. All defendants have been shown to have participated in that offer and sale or the proceeds thereof in violation of the Securities Laws. 15 U.S.C. §§ 77t(b), 78u(e), 77v(a) and 78aa.

In such an action this court has the power not only to grant the requested injunctive relief but power to grant the requested ancillary relief in the form of an order directing defendants to surrender all proceeds, together with income and profits, and to appoint a trustee of such funds for the benefit of all defrauded purchasers. Securities and Exchange Commission v. Texas Gulf Sulphur Co.,

312 F.Supp. 77, 90–93 (S.D.N.Y.1970), aff'd 446 F.2d 1301, 2 Cir., filed June 10, 1971; Lankenau v. Coggeshall & Hicks, 350 F.2d 61 (2d Cir. 1965); Esbitt v. Dutch-American Mercantile Corp., 335 F.2d 141, 143 (2d Cir. 1964); Los Angeles Trust Deed & Mortgage Exchange v. Securities and Exchange Commission, 285 F.2d 162, 181–182 (9th Cir. 1960), cert. denied, 366 U.S. 919, 81 S.Ct. 1095, 6 L.Ed.2d 241 (1961); Securities and Exchange Commission v. Bartlett, 422 F.2d 475, 477–478 n. 6 (8th Cir. 1970); Securities and Exchange Commission v. Bowler, 427 F.2d 190, 197–198 (4th Cir. 1970); Securities and Exchange Commission v. Golconda Mining Co., 327 F. Supp. 257 (S.D.N.Y.1971); Securities and Exchange Commission v. H. S. Simmons & Co., 190 F.Supp. 432 (S.D.N.Y. 1961).

The anti-fraud sections of the Securities Laws makes it unlawful for any person in connection with the offer or sale or purchase of any security (by the use of any means of interstate communication or by use of the mails or any facility of any national securities exchange) to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. 15 U.S.C. §§ 77q(a), 78j(b) and Rule 10b–5, 17 C.F.R. 240. This provision was violated by Manor and each of the selling shareholders whose names appear in the December 8, 1969 registration statement and prospectus. Cf. Securities and Exchange Commission v. Bangor Punta Corp., 331 F.Supp. 1154 at p. 1161 (S.D.N.Y.1971); Danser v. United States, 281 F.2d 492, 496–497 (1st Cir. 1960).

The registration statement and prospectus were not amended as required to reflect the fact that, when the Manor stocks were not selling as well as expected, arrangements were made with the Deneso Group and Netelkos and others to pay them special compensation for their purchasing and selling efforts. These undisclosed special compensation arrangements were made by Feinberg and Ezrine, acting on behalf of all selling shareholders, in an effort to make it appear that the entire issue had been sold and compensation paid only in accordance with the terms of the prospectus. The failure to amend the prospectus to reflect these arrangements constituted a fraud upon public purchasers who relied on the prospectus. Such subscribers were unknowingly paying a disproportionately high price for their shares. These payments also diverted funds from the stated goals of the prospectus unknown to subscribers. See 1 Loss, Securities Regulation, 293 (2d ed. 1961).

The anti-fraud provisions of the Securities Laws also make it unlawful for any person in connection with the sale or purchase of securities to make any false statement with respect to any material fact. They also make it unlawful for any person to engage in any act, practice or course of business which operates as a fraud or deceit upon any person in connection with the sale or purchase of any security. The selling shareholders violated these provisions by 1) stating in the prospectus that any funds collected would be held in a special account until the entire issue had been sold and promptly returned if unsold, 2) letting that statement stand uncorrected as they distributed among themselves such cash as was realized at the closing, and 3) then continuing to offer the stocks under the unamended prospectus.

Feinberg and Ezrine knew at the closing that the entire issue had not been sold as set forth above. All of the selling shareholders knew or should have known a few days after the closing, when the checks which they had received from the underwriter "bounced", that the entire issue had not been sold and that sufficient funds had not been received to validate an "all or none" sale. Instead of returning the funds received from the underwriter, Feinberg retained the more than $500,000 which he had received. The other selling shareholders retained payments later paid to them by Manor out of proceeds received from subscribers. Ezrine and his companies took other Manor shares in payment after the checks

which they had received "bounced," 17,-000 of which they later sold for $10 per share. The statements made in the prospectus were rendered untrue by the retention of the funds by the defendants who knew the issue had not been sold and such retention operated as a fraud upon subscribers.[1] Cf. Securities and Exchange Commission v. Capital Gains Research Bureau, 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). The fact that the statements were true when made does not relieve the selling shareholders of liability. The statements became untrue to the knowledge of all selling shareholders a few days after February 20, 1970 and prior to the expiration of the 90 day selling period. These untrue statements remained in the prospectus as the defendants continued to offer and sell the shares after the closing and after they discovered that the issue had not been entirely sold.

■ Defendants Samuel Feinberg, Marnane and Halford by their acceptance of the monies paid to them after the underwriter's checks "bounced" and by their silence and inaction aided and abetted the fraud. Pettit v. American Stock Exchange, 217 F.Supp. 21, 28 (S.D.N.Y. 1966).

■ The fraud was also aided and abetted by the defendant underwriter Benjamin Werner who failed to set up the escrow account, who continued to offer the stock for sale after the closing and who, of course, knew at the closing that all of the shares had not been sold. Werner also aided and abetted the fraud by paying more than $500,000 to Feinberg at the closing when he knew that the entire issue had not been sold since at least $1,700,000 worth of the checks, other than the checks of the underwriters, were uncertified and uncleared.

■ Ezrine, as counsel to the selling shareholders, aided and abetted the fraud by failing to advise Feinberg and the other selling shareholders that the February 20, 1971 closing was invalid and that the money had to be returned when it became clear at the closing (and on March 8, 1970, the expiration of the 90 day selling period) that the entire issue had not been sold and could not be sold. He also aided and abetted the fraud by actively participating in the special compensation arrangements with the Deneso and Netelkos groups, by making a special arrangement with Haber, and by selling 60,000 shares to the Daytona Beach General Hospital after the closing at $11 per share. He was fully aware of the fact that amendments to the prospectus were required to reflect post prospectus events of a material character since he did prepare a sticker on February 24, 1970 to reflect the fact that the brokerage firm of Carlton-Cambrige had joined the un-

---

[1] Defendant Feinberg claimed to have completed the offering by reinvesting at the closing his proceeds of the original stock issue. And, in the case of Ezrine, he claimed to have reinvested the proceeds of a loan made by one of his companies, the Great Oil Basin, to Manor which loan had been repaid by Feinberg out of the proceeds of the public offering. Ezrine claims these were the stock he later sold. That is, defendants were clearly issued checks from the proceeds of the offering after some, but not all, of the stock had been sold. They then used the money represented by those checks to purchase offered stock for friends or themselves or companies they controlled, thereby, in their view, completely selling out the Manor issue. Obviously, these defendants had no right to the initial proceeds payments in the first place, since under no theory could the issue be said to have closed at that time. Defendants last minute purchase of the remaining shares was therefore invalid, and the issue remained fraudulently unsold.

Even defendants' purchase of the Manor shares with their own funds, which did not occur here, would not suffice to effect a valid closing. Rule 10b-6, 17 C.F.R. 240, promulgated under 15 U.S.C. § 78j(b) makes it a "deceptive device" for any issuer or other person on whose behalf a distribution is being made to purchase any securities that are the subject of such distribution until after he has completed his participation in that distribution. Since defendants' purchases of the Manor offering took place before their participation was completed, purchase of Manor securities even with their own funds would violate Rule 10b-6.

derwriter's group. He never prepared a sticker regarding the special compensation arrangements or the fact that the selling period would be extended.

■ Defendants Christos Netelkos, Method Leasing, Upton Corporation, Deneso Corporation, Joseph Delmonico, and Jack Naiman violated the anti-fraud provisions by presenting checks for payment of stock at the closing backed by grossly insufficient funds. This was clearly an act which operated as a fraud or deceit upon a person in connection with the purchase of securities. When Feinberg and Ezrine failed to have funds returned to subscribers upon discovery of this fraud, and instead made arrangements with Netelkos to pay later and with Werner to re-offer the Deneso shares, these defendants aided and abetted this monstrous fraud. Deneso and Netelkos also aided and abetted the fraud of the other defendants discussed above when they agreed to accept special compensation in order to make it appear that the entire issue had been sold.

■ The aiding and abetting concept applies to securities transactions. Securities and Exchange Commission v. North American Research and Development Corp., 424 F.2d 63, 81–82 (2d Cir. 1970); Brennan v. Midwestern United Life Ins. Co., 259 F.Supp. 673, 681–682 (N.D.Ind.1966); Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 410 F.2d 135 (7th Cir. 1969).

■ Defendant Manor Construction Co., a company controlled by Feinberg, accepted proceeds from the sale of stock, which proceeds rightfully belong to public subscribers. No one may be permitted to retain funds which he or it knowingly received from a sale of stock which violated the Securities Laws. Securities and Exchange Commission v. Golconda Mining Co., *supra*.

■ In addition to being a misrepresentation of material fact, the failure to amend the prospectus and registration statement also resulted in a violation of 15 U.S.C. § 77e(b). That section prohibits the sending of securities through the mail or their carriage in interstate commerce for the purpose of sale, or delivery after sale, unless such securities are preceded or accompanied by a prospectus meeting the requirements of 15 U.S.C. § 77j(a). Section 77j(a), in turn, demands that a prospectus contain the information contained in the registration statement, with a few exceptions not pertinent here. The necessary contents of a registration statement are described in 15 U.S.C. §§ 77g, 77aa, Schedule A. From the facts described above it is clear that the Manor prospectus did not contain the information required by the following items of Schedule A: 1) use of proceeds (item 13), 2) estimated net proceeds (item 15) 3) price at which the security will be offered to the public and any variation therefrom (item 16), and all commissions or discounts paid to underwriters, directly or indirectly (item 17). The failure to amend the prospectus with respect to the above items which were required to be in the prospectus, is thus a violation of 15 U.S.C. § 77e(b).

■ Defendant Werner and Werner Co. violated another provision of the Securities Laws, Section 15(c) (2), of the Exchange Act, 15 U.S.C. § 78o(c) (2), and Rule 15c2–4. The rule defines the terms "fraudulent, deceptive or manipulative act or practice" used in Section 15(c) (2) of the Exchange Act to include the acceptance by a broker-dealer of any part of the sale price of any security being distributed in this type of an underwriting unless certain provisions are made to safeguard the funds thus accepted.

If the distribution is being made on an "all or none" basis, as the Manor offering was, the broker-dealer can handle the funds in one of two ways. He must deposit the funds in a separate bank account, as agent or trustee for the persons who have the beneficial interest therein, until the appropriate event or contingency has occurred, at which time he must promptly transmit or return such funds to the persons entitled thereto. Or, if he chooses, the broker-dealer

can transmit the funds received to a bank which has agreed in writing to hold all such funds in escrow for the persons who have the beneficial interest therein, and to transmit or return such funds directly to the persons entitled thereto when the appropriate event or contingency has occurred.

Defendant Werner and Co. did not establish an escrow account, and was therefore required to deposit subscribers' funds, amounting to approximately $1.9 million, in a separate bank account. It did not do so. Instead, it deposited funds subscribed to the Manor offering partly in an underwriting account, which had not been established specifically for the Manor offering, and partly in defendant Werner & Co.'s own checking account.

Furthermore, the firm was required to return deposited funds to public subscribers upon the failure of the entire issue to be sold. In disregard of this provision Werner & Co. instead forwarded the funds to the selling shareholders and others despite the fact that the issue was not fully subscribed. Both its failure to establish a separate bank account and its failure to return subscribers' funds when the issue was not fully subscribed were wilful, blatant violations of Section 15(c) (2) and Rule 15c2–4. Cf. Dlugash v. Securities and Exchange Commission, 373 F.2d 107 (2d Cir. 1967); Charles Hughes & Co. v. Securities and Exchange Commission, 139 F.2d 434 (2d Cir. 1943) cert. denied, 321 U.S. 786, 64 S.Ct. 781, 88 L.Ed. 1077 (1944).

Defendant Ira Feinberg contends, in his defense, that he was advised by Ezrine and Werner, particularly Ezrine, that all activities connected with the Manor offering were in compliance with the Securities Laws. Feinberg, according to his version, was led blindfolded through the thicket of securities legislation by Ezrine, who unfortunately led Feinberg astray. The facts clearly demonstrate, however, that Feinberg was fully aware of what was meant by an "all or none" offering, and of the neces-

sity of fully subscribing the issue before the sellers could receive the proceeds. He also knew that the issue could not be sold by offering special compensation or protection against loss to certain selected subscribers. Far from being an unwitting dupe of Ezrine, Feinberg was a knowing, active, and central participant in the whole undertaking.

Defendant Ezrine claims that he justifiably believed that the entire issue had been sold at the closing because checks for the total amount to complete the offering had been presented. The vast majority of these checks, in both number and amount, were not from underwriters and were uncertified. While a layman might understandably rely on a personal check in non-business dealings, an experienced securities lawyer is wholly unjustified in accepting uncertified checks in the type of "all or none" closing present here. The subsequent history of those uncertified checks amply demonstrates why such checks should not be credited in this type of transaction as a general rule. Checks from Deneso Corporation and Netelkos totalling over $2,500,000 were found to be backed by a grand total of $75.00. Contrary to his claim, Ezrine was completely unjustified in allowing the offer to close based on the payment of such uncertified checks.

This court may enjoin defendants upon a proper showing by the SEC. 15 U.S.C. §§ 77t(b), 78u(e). The elements of the showing needed to warrant an injunction under these sections are identical to those traditionally present in equity actions for injunctive relief. SEC v. Frank, 388 F.2d 486, 491 (2d Cir. 1968).

The test is thus whether the defendant's past conduct indicates, under all the circumstances, that there is a reasonable likelihood of further violations in the future. Goshen Mfg. Co. v. Hubert H. Myers Mfg. Co., 242 U.S. 202, 37 S.Ct. 105, 61 L.Ed. 248 (1916); SEC v. Culpepper, 270 F.2d 241, 249–250 (2d Cir. 1959). Included in the circumstances to which the court may look are the good

faith of any expressed intent to comply in the future, the effectiveness of any discontinuance of past violative conduct, and the character of the past violations. United States v. W. T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); SEC v. Culpepper, *supra*.

With the exception of defendants Samuel Feinberg, Suzanne Marnane and Gladys Halford, the defendants' violations were willful, blatant, and often completely outrageous. Far from ceasing their violative conduct, many of the defendants have retained the proceeds of their fraudulent scheme to this very date.

All of the defendants but Samuel Feinberg, Halford and Marnane continue in capacities similar to those they held at the time of their violations. In light of these considerations, the court finds injunctive relief appropriate against all defendants but Samuel Feinberg, Suzanne Marnane and Gladys Halford.

These latter three defendants were only on the periphery of the violative conduct. Though they did receive part of the proceeds of the sale of Manor stock, they did not actively participate in the offer, the closing or the ensuing attempts to sell Manor shares. Furthermore, from the evidence appearing at trial it appears unlikely that they will take part in securities offerings in the future. They therefore need not be enjoined, but they are required to disgorge the proceeds of their sale of Manor stock, and profits thereon, to the trustee to be appointed.

The court finds the appointment of a trustee for the proceeds of the Manor offering and the profits thereon both appropriate and necessary. As noted above, such action is well within the court's equity power. Defendant Ira Feinberg claims to be attempting to account for his ill-gotten gains, but the court finds him singularly inappropriate for this task in light of the findings of fact above. Moreover, Feinberg's records of subscription and repayment are very unclear; they are a totally inadequate basis for tracing the disposition of the Manor securities funds.

Therefore a trustee will be appointed. All defendants who retain proceeds from the Manor offering will be required to file an affidavit with the trustee and the court setting forth 1) the exact amount of proceeds of the closing which each received, 2) the location and disposition thereof; including the way in which said proceeds were invested and, 3) the income, if any, and/or profit received from such disposition or investment. They will also be required to disgorge any such funds and profits to the trustee.

The trustee will be directed to 1) take immediate possession and charge of all of the funds paid and to be paid to defendants Manor, Capital Cities, Feinberg, Ezrine, Werner & Co., Werner, Glendale, Atlantic Services, Netelkos, Method Leasing, Upton, Deneso, Delmonico, Naiman, Manor Construction, Sutton, Samuel Feinberg, Marnane and Halford, in connection with the public offering of Manor common stock pursuant to the registration statement which became effective on December 8, 1969, in whatever form those funds may now appear; 2) determine by examiantions of the books and records of any and all of the defendants the exact amount of the proceeds realized at the February 20, 1970 closing; 3) trace the actual disbursement to defendants and others of those proceeds of the closing; 4) use his best efforts to locate those members of the public who purchased stock in the Manor public offering and pay each person so located, out of the sums deposited with the trustee by the defendants, an amount equal to the price at which such Manor stock was purchased, plus interest.